1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11  SOVEREIGN GENERAL INSURANCE            No. 2:05-cv-0312-MCE-DAD
    SERVICES, INC., a California
12  corporation,                           Consolidated with
                                           2:05-cv-1389-MCE-DAD
13            Plaintiff,

14       v.                                **MEMORANDUM AND ORDER**

15  SCOTTSDALE INSURANCE COMPANY,
    an Ohio corporation, NATIONAL
16  CASUALTY COMPANY, a Wisconsin
    corporation, SCOTTSDALE
17  INDEMNITY COMPANY, an Ohio
    corporation, WESTERN HERITAGE
18  INSURANCE COMPANY, an Arizona
    corporation, R. MAX
19  WILLIAMSON, an individual,
    JOSEPH A. LUGHES, an
20  individual, and DOES 1 through
    100, inclusive,
21
              Defendants.
22
                            ----ooOoo----
23

24  ///

25  ///

26  ///

27  ///

28  ///

                              1

1     This consolidated litigation arises from the termination of

2 agency agreements between Sovereign General Insurance Services,

3 Inc. ("SGI"), a surplus line broker, and four insurance

4 companies, Scottsdale Insurance Company and its subsidiaries,

5 Scottsdale Indemnity Company, National Casualty Company and

6 Western Heritage (hereinafter collectively referred to as

7 "Scottsdale" unless otherwise noted).  SGI's initial lawsuit

8 (2:05-cv-1312-MCE-DAD), the lead case herein, alleges that

9 Scottsdale improperly deprived SGI of contingent commissions and

10 loss of prospective business in terminating its agreements.

11 Scottsdale subsidiary Western Heritage then proceeded to file its

12 own action (2:05-cv-1389-MCE-DAD) contending that SGI wrongfully

13 failed to remit insurance premiums due Western Heritage.  SGI's

14 Amended Counterclaim and Cross-Claim in that action (hereinafter

15 referred to as the "Counterclaim") presents allegations similar,

16 albeit in more detail, to that alleged in SGI's case-in-chief.

17 Hence, in now moving for summary adjudication, or alternatively

18 for summary adjudication as to certain claims, SGI has structured

19 its motion around the Counterclaim but seeks the same relief as

20 to both consolidated actions.

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**BACKGROUND**

In 1995, SGI entered into general agency and profit-sharing agreements with the Scottsdale entities pursuant to which SGI placed insurance business written by Scottsdale.[1]  Those agreements uniformly provided for termination, with or without cause, upon thirty (30) days written notice by any party. (Scottsdale's Undisputed Fact ("UF") Nos. 1, 4, 13, 15).  In the event of termination, the profit-sharing component of the agreements provided that no further contingent commissions (based on underwriting profitability) would be earned or due until outstanding liabilities, including loss reserves, had been satisfied on business placed by SGI.  (UF Nos. 6, 17).

With respect to Western Heritage, but not the other Scottsdale entities, SGI further had certain renewal rights concerning the use and control of policy "expirations".  As long as all premium amounts payable for business written with Western Heritage had been remitted, the Western Heritage Agency Agreement provided that the "use and control of expirations would remain the property" of SGI.  (See Western Heritage Agreement, Ex. 31 to Decl. of Anthony J. Barron, ¶ 7.1).[2]

///

///

---

[1]SGI's agreement with Western Heritage was effective July 10, 1995; it later entered into separate agreements collectively with the other Scottsdale entities on August 14, 1995.

[2]While SGI argues that the language of the Agreement should apply only to premium amounts actually collected, ¶ 4.1 makes it clear that whenever a policy is issued, "a premium will be deemed to be payable".

1        In addition to the agency agreements as discussed above, SGI
2   also itself purchased, beginning in 1998, a series of errors and
3   omissions policies from one of the Scottsdale subsidiaries,
4   National Casualty, to satisfy contractual obligations imposed by
5   Scottsdale that required such coverage.  (UF No. 20).  After a
6   claim was made against that policy in 2001, National Casualty
7   filed a declaratory relief action seeking judicial determination
8   as to whether it owed any duty to defend or indemnify SGI on that
9   claim.  According to Scottsdale's counsel, on June 21, 2004,
10  during the trial of that coverage action, SGI's Chairman and
11  Chief Executive Officer, Martin F. Sullivan, sent a letter to the
12  California Insurance Wholesaler's Association complaining about
13  the National Casualty policy and the treatment his company
14  received after making the above-referenced claim.  (Scottsdale's
15  Moving Points and Authorities, 4:18-26).[3]  Thereafter, on June 28,
16  2004, in response to this public criticism from its agent,
17  Scottsdale provided written notice to SGI that it was terminating
18  its agreements with SGI effective August 1, 2004.  (Id. at 4:27-
19  5:3, see Barron Decl., Exs. 7, 8).

20       Scottsdale has produced uncontroverted evidence that
21  outstanding liabilities on SGI's business in effect at the time
22  it terminated SGI's agreements had still not been satisfied more
23  than two years post termination.
24  ///
25  ///

26  _____

27       [3]While Scottsdale did not attach a copy of this letter to
    its Motion, SGI has not disputed Scottsdale's recitation of its
28  contents.

4

1  (Decl. of Shannon M. Aughe, ¶¶ 4-5; Decl. Of Lawrence J. Genalo,

2  Jr., ¶¶ 4-5).[4]  Consequently, the Scottsdale entities argue that

3  any additional contingent commissions remain unpayable under the

4  terms of the agreements.  Moreover, with respect to SGI's renewal

5  rights to policy expirations on its Western Heritage business,

6  Western Heritage has shown that premium amounts have continued to

7  remain unpaid. Therefore it contends that any renewal rights also

8  remain unvested.  SGI's President, Fred Godinez, admitted at his

9  deposition that premiums due to Western Heritage at the time of

10 termination had not been paid.  (Godinez Dep., 60:25-61:4, Ex. B

11 to the Barron Decl.).  SGI does not dispute Western Heritage's

12 contention that all premiums had not been accounted for at that

13 time.  (UF No. 10).  As of April 30, 2006, nearly two years

14 later, SGI still owed some $756,582.89 in unpaid premiums

15 according to Western Heritage records.  (Aughe Decl., ¶ 12).

16 When SGI President Godinez was deposed in June of 2006, he

17 admitted that SGI still had not paid some $180,000.00 in premiums

18 even though he apparently did not believe that Western Heritage's

19 estimate as enumerated above remained correct.  (Godinez Dep.,

20 June 19, 2006, 25:26:22; 31:14-22, Ex. C to the Barron Decl.).

21 ///

22 ///

23 ///

24 ///

25 

26     [4]Although SGI purports to raise a triable issue of fact in
   this regard with respect to Scottsdale's Undisputed Fact Nos. 7
27 and 18, the evidence cited refers not to outstanding liabilities
   but instead to uncollected premiums. (Decl. of Fred Godinez, ¶
28 10).

1  Kathy Brignolio, an SGI employee whose duties include determining

2  the amount of premiums still owing to Western Heritage, also

3  confirmed that as of June 2006 she had not yet "caught up" on

4  verifying open items and remitting premium payments to Western

5  Heritage.  (Brignolio Dep., 144:15-145:12; 146:24-147:15, Ex. A

6  to Barron Reply Decl.).

7      In now moving for summary judgment, Scottsdale contends that

8  because its actions were consistent with the terms of its

9  agreements with SGI, it cannot be liable for claims premised

10  either on breach of contract or upon other wrongful conduct like

11  interference with prospective advantage.  In addition, with

12  respect to SGI's fraud claim, Scottsdale asserts that SGI has not

13  identified any misrepresentation giving rise to an actionable

14  claim in that regard.  SGI, on the other hand, claims that

15  material issues of fact preclude summary judgment because

16  Scottsdale owed, but did not pay, profit sharing commissions due

17  SGI on June 30, 2004, prior to the August 1, 2004 date of

18  effective termination.  SGI also maintains that termination was

19  improper in the first place on grounds that Scottsdale intended

20  to wrongfully deprive SGI of its renewal ownership rights on a

21  highly lucrative book of business that SGI had carefully

22  cultivated and maintained.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  *See* Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); *see also* Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party.  U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

///

///

///

7

1  Once the moving party meets the requirements of Rule 56 by
2  showing that there is an absence of evidence to support the non-
3  moving party's case, the burden shifts to the party resisting the
4  motion, who "must set forth specific facts showing that there is
5  a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477
6  U.S. 242, 256 (1986). Genuine factual issues must exist that
7  "can be resolved only by a finder of fact, because they may
8  reasonably be resolved in favor of either party." Id. at 250.
9  In judging evidence at the summary judgment stage, the court does
10 not make credibility determinations or weigh conflicting
11 evidence. See T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809
12 F.2d 626, 630-631 (9th Cir. 1987), citing Matsushita Elec. Indus.
13 Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
14
15                          **ANALYSIS**
16
17 **1.    Claims Premised on Contractual Breach.**
18
19        As enumerated above, it is undisputed that SGI's agreements
20 with Scottsdale are "at-will" in that they allow for termination
21 with or without cause upon thirty (30) days notice. Termination
22 of an at-will contract cannot normally form the basis of either
23 breach of contract or the corresponding tort of breach of the
24 covenant of good faith and fair dealing, which depends upon an
25 underlying contractual breach. See EPIS, Inc. v. Fid. & Guar.
26 Life Ins. Co., 156 F. Supp. 2d 1116, 1125-1128 (N.D. Cal. 2001).
27 ///
28 ///

1    The parties agree that Arizona law applies in issues
2 pertaining to the interpretation and enforcement of the
3 agreements at issue, given choice of law provisions to that
4 effect contained within said agreements.  (See Barron Decl., Ex.
5 31, ¶ 12.14; Ex. 4, ¶ X(K).  Arizona law upholds the validity of
6 at-will termination rights absent some public policy violation
7 like race or gender discrimination.  <u>See</u> <u>Consumers Int'l, Inc. v.</u>
8 <u>Sysco Corp</u>. 951 P.2d 897, 902-03 (Ariz. Ct. App. 1997).  Here, in
9 an attempt to invoke the public policy concerns necessary to
10 vitiate the import of at-will provisions, SGI argues that its
11 termination by Western Heritage[5] was wrongful because it was
12 effectuated in order "to deprive SGI of its contractual and
13 statutory rights to ownership of the renewals of policies it had
14 placed ... prior to termination."  (Opp'n, 1:16-19).  SGI's
15 argument fails.

16    First, with respect to SGI's claimed contractual rights,
17 those rights are of course spelled out by the terms of the agency
18 agreements between the parties.  As stated above, the Western
19 Heritage Agency Agreement provides that the use and control of
20 policy expirations shall remain SGI's property, as long as all
21 premiums and other monies belonging to Western Heritage have been
22 paid by SGI:

23    "If, upon termination of this Agreement, the 'General Agent'
      has promptly accounted for and paid to the 'Company' all
24    'premiums' and other monies .... collected or held for or on
      behalf of the 'Company'.... the records of the 'General
25    Agent" and the use and control of expirations shall remain
      the property of the 'General Agent' and be left in his
26    undisturbed possession ..."

27 ────────────
28    [5]SGI makes no argument that termination was wrongful with
   respect to any of the other Scottsdale defendants.

9

1  (See Western Heritage Agreement, Ex. 31 to Barron Decl., ¶ 7.1).

2      Here, because it is undisputed that SGI has still not paid

3  all the premiums due to Western Heritage on the policies it

4  produced, under the express terms of the agreement SGI has no

5  unequivocal right to expirations upon which a breach of contract

6  can lie.  Indeed, the only argument advanced by SGI to avoid that

7  conclusion rests with its assertion that because "[t]he

8  contractual exclusion for the ownership right applies only to

9  premium received and held".  (Opp'n, 8:8-10).  SGI hence argues

10  that as long as it remitted all premiums it received, it could

11  assert its expiration rights even if additional premiums remained

12  unpaid and owing.  That interpretation of contractual language at

13  issue, however, is flatly contradicted by ¶ 4.2 of the Western

14  Heritage Agency Agreement, which states clearly that premiums are

15  "deemed to be payable" *whenever* a policy is issued.[6]  (Western

16  Heritage General Agency Agreement, Ex. 31 to the Barron Decl., ¶

17  4.2).

18      Having disposed of the contractual component to SGI's

19  contention that Western Heritage wrongfully terminated its agency

20  agreement so as to deprive it of policy expiration rights, we now

21  turn to SGI's asserted statutory grounds for avoiding the import

22  of the agreement's at-will provisions.  In that regard, SGI

23  points to the provisions of California Insurance Code § 769(d),

24  which provides in pertinent part as follows:

25

---

26      [6]SGI has not argued that any of its unpaid premium falls
within the only exception to this rule of thumb recognized by the
27  Agreement, situations wherein policies were returned within
thirty (30) days and resulted in no liability to Western
28  Heritage.  Id.

1      "if a terminated broker-agent is unable, after making a good
2      faith effort, to place existing policies with another
      insurer, the insurer then insuring the risk shall, at the
3      broker-agent's request, renew any insurance contract written
      by the broker-agent for the insurer for one policy term or a
      period of one year, whichever is shorter."

4

5 According to SGI, Western Heritage has violated § 769(d) by

6 converting the renewals and placing them with other agents.  SGI

7 claims that this claimed statutory violation implicates public

8 policy and hence permits it to avoid the strictures of at-will

9 termination.  SGI is wrong.

10     First, as stated above, the Western Heritage agreement

11 contains Arizona choice-of-law provisions.  Arizona law makes it

12 clear that to the extent a statutory violation encompasses public

13 policy concerns, the statute in question must be an Arizona

14 statute.  Wagenseller v. Scottsdale Mem. Hosp., 710 P.2d 1025,

15 1034 (Ariz. 1985) (in assessing whether a public policy violation

16 has occurred "we will look to the pronouncements of *our* founders,

17 *our* legislature, and *our* courts to discern the public policy of

18 *this* state" (emphasis added)).  While SGI argues that California

19 law should apply because SGI is licensed as a broker in

20 California, and because Western Heritage is an approved non-

21 admitted surplus line carrier within California, the fact remains

22 that both parties agreed to be bound by Arizona law in

23 construction and enforcement of their mutual agreement.  Having

24 made that agreement, SGI cannot now step forward and demand that

25 a contractual provision with respect to expiration rights, which

26 SGI admittedly has not satisfied, be utilized to create rights it

27 otherwise would not possess.

28 ///

1    Moreover, even were § 769(d) be relevant in assessing the
2 scope of SGI's expiration rights, which the Court believes it is
3 not, the statute still is of no avail to SGI under the
4 circumstances of this case.  Subdivision (e) of the statute
5 provides that renewal is not required in certain instances,
6 including when "the broker-agent has failed.... within 10 days
7 after written demand upon failure to remit funds within the time
8 limits set forth in the agency or brokerage contract.... to remit
9 funds due and owing to the insurer."  Cal. Ins. Code §
10 769(e)(1)(C).  The Western Heritage agreement provides that
11 premiums are due whenever a policy is issued, with the balance
12 owed to be paid not later than forty-five (45) days after the end
13 of the month on which the account in question appears.
14 (Agreement, Ex. 31 to the Barron Decl., ¶¶ 4.1 and 4.2).  Here,
15 SGI did not pay despite what it itself acknowledged were repeated
16 demands for premium payment by Western Heritage.  (Brignolio
17 Dep., 139:9-140:3; Ex. A to the Barron Reply Decl.).
18 Consequently SGI cannot rely on the savings provisions of § 769
19 in any event.

20    In addition, the terms of § 769(d) require on their face a
21 terminated agent-broker like SGI to specifically request an
22 extension of renewals, after itself making a good-faith effort to
23 successfully place the business in question elsewhere, in order
24 to claim protection under the statute.  The only request alleged
25 to comply with § 769 that has been identified by SGI is a July
26 27, 2004 letter to Scottsdale from SGI's attorneys.  (Godinez
27 Decl., ¶ 7).
28 ///

1   Examination of that letter, however, as attached to Scottsdale's

2   Reply, states only that "it is anticipated that SGI will be

3   required to avail itself of the protections granted [by § 769]

4   after making a good faith effort to replace coverage with another

5   carrier pursuant to subsection (h)(2)."  (See Ex. A to Decl. of

6   Todd J. Miller, p. 2).  This statement of potential need in the

7   future, however, which by its terms depends upon SGI's attempts

8   to place policies elsewhere, falls short of an unequivocal

9   request in the present triggering protection under the statute.

10       The only other contractual breach identified by SGI in its

11   Opposition to this motion concerns its claim that a contingent

12   commission payment was due and owing to SGI on June 30, 2004,

13   prior to the August 1, 2004 effective date of termination.  SGI

14   maintains that that payment should have been made even if other

15   payments were, under the provisions of the agency agreements,

16   held in abeyance until all outstanding liabilities and claims

17   against the policies in question had been fully resolved.  SGI's

18   claim in that regard, however, suffers from the fact that SGI

19   admits it owed the Scottsdale entities unpaid premium in July of

20   2004, prior to the effective date of agency termination on August

21   1, 2004.  (Brignolio Depo., 71:5-9).  SGI had also apparently not

22   responded to open item recap requests made in April, May, and

23   June of 2004 prior to notice of termination.  (Id. at 139:9-

24   140:3).

25   ///

26   ///

27   ///

28   ///

1    The Western Heritage Agreement provides plainly that the
2  right of any agent to receive commission payments "shall at all
3  times be subordinate to the right of the 'Company' to offset or
4  apply 'Commissions' against any indebtedness of the 'General
5  Agent' to the 'Company'. (Agreement, Ex. 31 to the Barron Decl.,
6  ¶ 4.6).  This means that SGI cannot claim entitlement to interim
7  commission payments if it owed funds, including premium payments,
8  to Western Heritage.  Western Heritage has shown that as of June
9  30, 2004, when a contingent commission payment was due, SGI owed
10 at least $806,404.80 in premiums for new policies and renewal as
11 demonstrated by an open items summary report.  (Aughe Reply
12 Decl., ¶ 4; Ex. 27).  As stated above, SGI has still not resolved
13 all those outstanding items.  As of June 2006, Western Heritage
14 has estimated that SGI still owes in excess of $750,000.00, and
15 while SGI disputes the entirety of that amount, its President,
16 Fred Godinez, admitted at his deposition that even in his
17 estimation some $180,000.00 was still due.  By Western Heritage's
18 calculations, the contingent commission that would have been owed
19 SGI on June 30, 2004 was some $62,262.00 (See Godinez Decl., Ex.
20 A).  Even if that amount should have been higher, as SGI claims,
21 there still appears to be no dispute that SGI owed more to
22 Western Heritage than it was due in contingent commissions as of
23 June 30, 2004.  Hence, given the offset rights accorded to
24 Western Heritage under the terms of its agency agreement, it did
25 not owe any payment to SGI as of June 30, 2004.  Hence there can
26 be no breach of contract in failing to remit owed contingent
27 commissions as SGI contends.
28 ///

14

1    Given the above, Western Heritage has rebutted any claim

2  that it breached the terms of its agency agreement with SGI.

3  Significantly, SGI does not even identify any actionable breaches

4  as to the other Scottsdale entities giving rise to contractual

5  claims.  Hence Scottsdale is entitled to summary adjudication as

6  to the First, Second, Third and Fourth Claims in SGI's Amended

7  Counterclaim for Breach of Contract and Breach of the Covenant of

8  Fair Dealing as to Western Heritage and the other Scottsdale

9  entities, respectively.[7]

10

11  **2.    Interference with Prospective Economic Advantage and
           Accounting Claims.**

12

13    SGI does not take issue with Scottsdale's assertion that

14  Arizona law, which as stated above governs the agency agreements

15  defining the parties' respective rights and obligations, follows

16  the Restatement of Torts formulation regarding interference with

17  prospective economic advantage:

18       Except as stated in Section 698 [betrothal promises], one
         who, without a privilege to do so, induces or otherwise
19       purposely causes a third person not to (a) perform a
         contract with another, or (b) enter into or continue a
20       business relation with another is liable to the other for
         the harm caused thereby.

21

22

23       [7]Although R. Max Williamson, Chief Operating Officer of
    Scottsdale Insurance, Scottsdale Indemnity, and National and
    Casualty, and Joseph A. Lughes, President of Western Heritage,
24  are also named as individual defendants in the implied covenant
    claims, Scottsdale argues that no contractual liability as to
25  either individual has been identified apart from their roles on
    behalf of the corporate entities, which as set forth above are
26  not actionable.  SGI has not refuted that contention, and indeed
    makes no argument whatsoever that either Williamson are Lughes
27  committed any independent contractually based breaches for which
    they could incur liability for either breach of contract or
28  breach of the implied covenant of good faith and fair dealing.

15

1  Restatement of Torts § 766; see Pre-Fit Door v. Dor-Ways, Inc.,
2  477 P.2d 447, 559-560 (Ariz. Ct. App. 2001).

3      Irrespective of whether Arizona or California law applies,
4  both jurisdictions require a plaintiff asserting an interference
5  claim to prove that the asserted interference was wrongful or
6  improper.  See Strojnik v. Gen'l Ins. Co. of Am., 36 P.3d 1200,
7  1202 (Ariz Ct. App. 2001) (referring to the need to demonstrate
8  "the impropriety of [the] interference"); Della Penna v. Toyota
9  Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 392 (1995)
10 (wrongfulness need be shown "by some other measure beyond the
11 fact of interference itself").

12     Here, SGI asserts claims for both negligent and intentional
13 interference.  With respect to the negligence based claim, SGI
14 does not dispute Scottsdale's claim that Arizona law does not
15 recognize negligent interference with prospective economic
16 advantage as a tort.  See. e.g., Southwest Pet Prods. v. Koch
17 Indus., Inc., 89 F. Supp. 2d 1115, 1131 (D. Ariz. 2000); Edwards
18 v. Anaconda Co., 565 P.2d 190, 192 (Ariz. Ct. App. 1977).
19 Moreover, and in any event, the only allegedly improper conduct
20 giving rise to interference in the first place is, according to
21 SGI, "the wrongfulness of the termination as a pretext to deprive
22 SGI of contractual rights to contingent commissions and ownership
23 of renewals" (Opp'n, 8:13-15).  As demonstrated above, however,
24 SGI has not shown that the termination of its agency agreements
25 was either wrongful or at odds with the contractual provisions
26 contained within said agreements.  Consequently, just as no
27 contractually based claims have been shown, so have no
28 interference claims been established.

1    Similarly, SGI's counterclaim for an accounting depends upon

2  the validity of its claims for additional contingent commissions

3  and/or policy expiration rights for which an accounting would be

4  required.  Since SGI has not established its entitlement to any

5  additional monies upon which an accounting could be necessary,

6  SGI's accounting claim necessarily fails.

7

8  **5.   Fraud.**

9

10    SGI's final claim alleges fraud on behalf of all the

11  Scottsdale Defendants, as well as individual defendants

12  Williamson and Lughes, in inducing it to purchase an errors and

13  omissions policy from National Casualty that would provide

14  professional liability coverage for SGI's role as a wholesaler,

15  general agent, and surplus line broker.  According to the Amended

16  Counterclaim, Scottsdale's representations as to the scope of

17  coverage "were false and knowingly made," with SGI relying on

18  such falsehoods to its detriment in purchasing the policy.

19  (Amended Counterclaim, ¶¶ 115-17).

20    SGI's factual basis in alleging fraud stems from its

21  presentation to National National Casualty of a claim made

22  against SGI by Lloyd's of London.  SGI claims that a subsequent

23  declaratory relief action designed to ascertain whether coverage

24  existed for the claim was "without basis and designed to prevent

25  SGI from enjoyng the benefit of its E&O policy regarding the

26  Lloyd's claim."  (Opp'n, 8:17-18).

27  ///

28  ///

1 Although the agency agreements between Scottsdale and SGI have

2 been interpreted and enforced in accordance with Arizona law by

3 virtue of the choice-of-law provisions contained in those

4 agreements, SGI's fraud allegations call for the application of

5 California law since they involve sale of an insurance policy, by

6 a carrier admitted to transact business in California, to a

7 California insured (SGI).

8      In order to state a viable fraud claim under California law,

9 SGI must show 1) a misrepresentation; 2) made with knowledge of

10 its falsity; 3) made with the intent to defraud (i.e., to induce

11 reliance); 4) upon which SGI reasonably relied; 5) resulting in

12 damage to SGI.  Cal. Civ. Code § 1709.

13      SGI cannot claim that it was induced to purchase a

14 "worthless" policy since the National Casualty policy at issue

15 ultimately provided and paid the contracted-for coverage.  At

16 most, as indicated above, SGI's fraud claim would appear to

17 revolve an accusation that Scottsdale made a misrepresentation as

18 to whether a claim would be covered without resort to a

19 declaratory relief action to determine coverage.  SGI's Chief

20 Executive Officer, Martin F. Sullivan, who is undisputedly an

21 experienced industry professional (UF No. 25), could, however,

22 identify nothing he was told by anyone associated with issuance

23 of the policy that he ultimately determined was untrue.

24 (Sullivan Dep., 201:6-10, Ex. D to the Barron Decl.).

25 ///

26 ///

27 ///

28 ///

1  SGI has not put forth any evidence, for example, that it was told
2  that no declaratory action would ever be filed in order to assess
3  the propriety of coverage, and such an argument would belie
4  credibility had it in fact been advanced, particularly for an
5  insurance agency like SGI familiar with the mechanics of claims
6  processing.

7       SGI has not proffered an actionable misrepresentation, let
8  alone a misrepresentation made with knowledge of its falsity and
9  with intent to induce reliance on SGI's part in purchasing the
10  National Casualty policy.  That fundamental shortcoming dooms the
11  viability of SGI's fraud claim, and compels a conclusion that
12  summary adjudication on such claim be granted.

13

14                            **CONCLUSION**

15

16       For all the foregoing reasons, summary judgment is GRANTED
17  in favor of both the Scottsdale entities, as well as the
18  individually named Defendants, on all claims asserted by SGI in
19  these consolidated proceedings.[8]

20       IT IS SO ORDERED.

21
   Dated: February 16, 2007
22

23

24                            MORRISON C. ENGLAND, JR.
                              UNITED STATES DISTRICT JUDGE
25

26

27       [8]Because oral argument will not be of material assistance,
   the Court orders this matter submitted on the briefs.  E.D. Cal.
28  Local Rule 78-230(h).

                                 19